## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARIO DEL CURTO,**

     **Plaintiff,**

**vs.**                                       **Case No. 14 CV 561 JAP/SCY**

**RICHARD V. LOPEZ, II,**
**in his individual and official capacities,**
**GEORGE VAN WINKLE, Police Chief,**
**in his individual and official capacities, and**
**CITY OF SOCORRO,**

     **Defendants.**

### MEMORANDUM OPINION AND ORDER

Defendants Richard V. Lopez, II (Officer Lopez), Chief of Police George Van Winkle (Chief Van Winkle), and the City of Socorro (the City) seek partial summary judgment dismissing two of the claims brought by Plaintiff Mario Del Curto (Plaintiff). *See* DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON CIVIL RIGHTS CLAIMS AGAINST OFFICER LOPEZ ON THE BASIS OF QUALIFIED IMMUNITY, QUASI JUDICIAL IMMUNITY AND ABSOLUTE PROSECUTORIAL IMMUNITY (Doc. No. 22) (Motion). Plaintiff opposes the Motion. See PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CIVIL RIGHTS CLAIMS AGAINST OFFICER LOPEZ ON THE BASIS OF QUALIFIED IMMUNITY, QUASI JUDICIAL IMMUNITY AND ABSOLUTE PROSECUTORIAL IMMUNITY (Doc. No. 40) (Response). Defendants filed a REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON CIVIL RIGHTS CLAIMS (Doc. No. 48) (Reply).

The Court will grant the Motion. Officer Lopez is entitled to qualified immunity from Plaintiff's Fourth Amendment claims in Count I and Count 9 of the COMPLAINT (Doc. No. 1).

Officer Lopez had probable cause to arrest Plaintiff because Officer Lopez had credible information from which he reasonably believed Plaintiff had committed a crime. Even though Officer Lopez entered Plaintiff's home without a warrant, he had exigent circumstances allowing him to enter. However, even if there were insufficient exigent circumstances, a recent Tenth Circuit case has made the law in this area unclear. Officer Lopez is not entitled to quasi-judicial immunity from Plaintiff's Count I claim because Officer Lopez was investigating a reported crime and was not executing a court order when he entered Plaintiff's home. In addition, the Court will dismiss Plaintiff's Count 7[1] claim against Officer Lopez for defamation because Officer Lopez is entitled to absolute immunity for his testimony in Plaintiff's criminal proceeding.[2]

I.      SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

   A.      *Legal Standard for Qualified Immunity*

   A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify evidence of record that would entitle him to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The analysis is different when a defendant asserts qualified immunity on summary judgment regarding claims brought under 42 U.S.C. § 1983. *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). The burden of proof shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of defendant's conduct.

---

[1]      In the Complaint, plaintiff uses Roman numerals to identify Counts I and II, but he uses Arabic numerals for Counts 3-9. To avoid confusion, the Court will do the same.

[2]      The Court dismissed claims against Officer Lopez and Chief Van Winkle in their official capacities. The Court also dismissed Counts 4 for intentional infliction of emotional distress and 5 for negligent infliction of emotional distress because immunity has not been waived for those torts under the New Mexico Tort Claims Act (NMTCA). *See* MEMORANDUM OPINION AND ORDER (Doc. No. 44).

*Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). If the plaintiff fails to satisfy either prong, the defendant is entitled to qualified immunity. *Id.*

To satisfy the first prong of the qualified immunity test, the plaintiff must do more than simply allege that the defendant has violated a constitutional right. The plaintiff must identify which clearly established right is at issue and point to specific acts by the defendant that violated the right. *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995). To satisfy the second prong of the test, the plaintiff must show "'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). Only if the "plaintiff successfully carries his two-part burden," upon a consideration of the facts in the light most favorable to the plaintiff, does the "defendant bear[] the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Walton v. Gomez*, 745 F.3d 405, 412 (10th Cir. 2014).

B.    *Determining the Facts*

Defendants have attached to their Motion a copy of the recording from a lapel camera worn by Officer Lopez during the encounter that led to the arrest of Plaintiff. (Mot. Ex. F.) In evaluating a motion for summary judgment in a §1983 case, courts are instructed to take the facts "in the light most favorable to the party asserting the injury." *Scott v. Harris*, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts" unless the plaintiff's version "is so utterly discredited by the record that no reasonable jury could have believed him[.]" *Id.* at 378, 380. In *Scott v. Harris*, the plaintiff sued under § 1983 for injuries he sustained in a high speed police chase. The Supreme Court found that the lower courts erred in accepting the plaintiff's contention that he was not driving dangerously because a video

3

recording from a police vehicle depicted otherwise. *Id.* The Supreme Court held that the lower courts should have viewed the facts as shown in the video recording. *Id.* Hence, to the extent either Plaintiff's or Defendants' factual averments are contradicted by the events revealed by the video recording, the Court will rely on the video.

II.    BACKGROUND[3]

A.    *Undisputed Facts Regarding Incident on January 15, 2013*

On January 15, 2013, Plaintiff drove to Mr. Leo Rosas' house, knocked on Mr. Rosas' front door, and when the door was opened, Plaintiff punched Mr. Rosas in the eye. *See* Criminal Complaint, *State v. Mario Del Curto*, M-52-MR-201300035 (Mot. Ex. A.) According to the police report, Plaintiff told Rosas that he was "the cause of [Plaintiff's] marriage falling apart . . . ." (Mot. Ex. B at 3.) Mr. Rosas reported that Plaintiff, "had threatened to kill him and was afraid of what [Plaintiff] might do to him. . . . [Plaintiff] was extremely drunk. . . ." (*Id.*)

On February 22, 2013, the Socorro Magistrate Court entered a Stipulated Continuance and Time Waiver (Stipulated Continuance Order). (Mot. Ex. C.) In the Stipulated Continuance Order, Plaintiff was ordered to have no contact with Mr. Rosas, Plaintiff was forbidden from possessing firearms or ammunition, Plaintiff was ordered to obey all laws, and Plaintiff was prohibited from possessing or consuming alcohol or illegal drugs. (*Id.*) Plaintiff had to "submit to a breath, blood or urine test upon the request of law enforcement or any officer of the court," and Plaintiff had to "report to the Socorro Magistrate Court as requested . . . to check on [his] progress[.]" (*Id.*) Upon successful completion of those terms for one year, the court would dismiss the criminal complaint against Plaintiff. (*Id.*)

---

[3]    The facts recited in the Background section are undisputed either because the parties agree as to the facts, the video depicts the facts, or the evidence of record supports the facts and any dispute is immaterial or unsupported.

B. *Undisputed Facts Regarding Incident on August 16, 2013*

Around 11:30 am on August 16, 2013, an individual, later identified as Mr. Max Torres, reported to Socorro police that Plaintiff left a threatening telephone message on Mr. Torres' telephone voicemail. (*See* Criminal Complaint, *State v. Mario Del Curto*, No. M-52-MR-201300666, Mot. UMF 7-8; Mot. Ex. D; Reply Ex. A.) In the message, Plaintiff stated that he had a gun and would kill Mr. Torres' son because Plaintiff believed Mr. Torres' son was having an affair with Plaintiff's wife. (*Id.*) Plaintiff claimed he was "loading the gun as he [spoke]." (*Id.*) At approximately 1:00 pm, Mr. Torres reported that Plaintiff left a second threatening message. (Reply Ex. A.)[4]

At approximately 12:30 pm, Officer Justin Gonzales was dispatched to Mr. Torres' house to investigate his initial complaint. (Mot. Ex. D.) While en route to Mr. Torres' home, Officer Gonzales noticed Mr. Torres driving in the direction of Plaintiff's house. (*Id.*) Officer Gonzales conducted a traffic stop of Mr. Torres' vehicle and radioed Officer Lopez to assist him in preventing Mr. Torres from going to Plaintiff's house. However, a few minutes later, Officer Gonzales cancelled the request stating he was able to get Mr. Torres "under control." (*Id.*) Officer Gonzales instructed Officer Lopez and Officer Valenzuela to go to Plaintiff's house to investigate the threat while Officer Gonzales stayed with Mr. Torres. (*Id.*) As instructed, Officer Lopez and Officer Valenzuela went to Plaintiff's residence. (*Id.*) Officer Lopez was aware of the conditions imposed on Plaintiff by the Stipulated Continuance Order. (*Id.*)

---

[4]        Plaintiff attempts to dispute Defendants' Undisputed Material Fact (UMF) 7 arguing that Defendants "have not offered any admissible evidence that Max Torres, Jr. called the police [, and the] allegation that a person called is unsupported by credible admissible evidence and it is a disputed material fact precluding summary judgment." (Resp. at 1–2.) Plaintiff also disputes Defendants' UMF 8 arguing that Defendants have not offered admissible evidence of who "this individual" is that called police a second time. (*Id.* at 2.)
        Defendant responds that UMF 7 and 8 state that an "individual" called police and reported that Plaintiff had threatened to kill the individual's son and that the same individual called a second time to report another threat. The identity of the person as Max Torres is supported by the criminal complaint. (Mot. Ex. D.) The Court rejects Plaintiff's arguments.

At approximately 1:10 pm, Officer Lopez and Officer Valenzuela arrived at Plaintiff's residence. (Mot. Ex. D; Mot. Ex. F DVD from lapel camera.) After Officer Lopez knocked on the front door several times, knocked on a side window, and repeatedly rang the doorbell, Plaintiff answered the door wearing a bath robe. (DVD 13:10:55–13:12:18.) Officer Lopez "immediately detected the strong odor of a[n] alcoholic beverage omitting [sic] from [Plaintiff's] person." (Mot. Ex. D.)[5] Officer Lopez informed Plaintiff that he and Officer Valenzuela were investigating a complaint that Plaintiff left a threatening message on Mr. Torres' phone. (DVD 13:12:27–13:12:29.) While standing in the doorway, Plaintiff told the officers that he phoned Mr. Torres' mother[6] the previous night to find out if she knew that her son was having an affair with Plaintiff's wife. But, Plaintiff denied threatening anyone, stepped back, and attempted to close the door. (DVD 13:12:29–13:12:55.) Officer Lopez approached the front door and said "we're talking to you . . . you're not going to shut the door . . ." (DVD 13:12:55–13:13:00.) While making these statements, Officer Lopez blocked the door to keep it open. (Compl. ¶ 21; DVD

---

[5]    Plaintiff denies drinking alcohol that day. (Resp. Ex. 1 ¶ 3.) However, the fact that Officer Lopez smelled alcohol is not a fact with which Plaintiff has personal knowledge; and he cannot directly dispute it. Defendants argue that the DVD shows Plaintiff was intoxicated by showing Plaintiff unsteady on his feet admitting he had been drinking on that day by pleading with Officer Lopez to "give him a break," and by acting out a "full gamut of emotions from anger to resignment [sic] and from friendliness to sorrow within the first five minutes of the tape." The Court has taken into account that Plaintiff disputes this fact, but the dispute does not affect the Court's overall ruling.

   Plaintiff also argues that Officer Lopez never asked him to submit to a drug or alcohol test. This fact, even though true, is not material to the ruling here. Defendants attempt to point to areas in the DVD recording that support Officer Lopez's opinion that Plaintiff was under the influence of alcohol, but the Court finds no definitive evidence in the DVD from which the Court can find as a matter of undisputed fact that Plaintiff was intoxicated. Therefore, this fact will be classified as disputed.

[6]    Apparently Plaintiff was referring to the complainant's wife, who was the mother of the person Plaintiff accused of having an affair with Plaintiff's wife. Because Max Torres, Sr., the complainant, is the father of Max Torres, Jr., it is understandable that Plaintiff may have thought the officers were referring to Max Torres, Jr.

13:12:57–13:13:03.)[7]

While Officer Lopez held the door open, Plaintiff said "let me call Lee Des Champs," Plaintiff's lawyer. (DVD 13:13:02.) Officer Lopez responded "you don't need to go anywhere 'til we're done talking to you. Right now we're doing an investigation." (DVD 13:13:04– 13:13:06.) Plaintiff responded "keep talking buddy," to which Officer Lopez responded, "[y]ou don't scare me one bit, Mr. Del Curto." (DVD 13:13:07–13:13:12.)[8] Plaintiff told Officer Lopez that he did not scare him either. (DVD 13:13:13) Officer Lopez then stated, "I have a right to come and talk to you. You're not gonna shut a door on me." (DVD 13:13:14–13:13:15.) Plaintiff opened the front door wider, told the officers to "come on in," and the officers stepped into the foyer of Plaintiff's home. (DVD 13:13:16–13:13:17.)

In the police report, Officer Lopez stated:

> Mr. Del Curto said he never threatened any one and tried to shut the door of the house. I held the door open and told Mr. Del Curto that I was not done talking to him, and that he wasn't going to shut the door on me. Within a few seconds of conversation, Mr. Del Curto opened the door and with out [sic] me asking, invited me into the home.

(Mot. Ex. D.) Based on the lapel video, the Court finds that Plaintiff opened the door while stating "come on in," but the Court does not accept Officer Lopez's

---

[7]    Plaintiff contends that Officer Lopez blocked the door with his foot; however, in the video, Officer Lopez's foot is not visible. The video shows Officer Lopez stepping close to the door to prevent Plaintiff from closing it. Defendants admit that Officer Lopez blocked Plaintiff from closing the door; therefore, it is immaterial whether Officer Lopez used his foot or some other means of blocking the door. The Court will accept for purposes of this ruling that Officer Lopez blocked the door to prevent it from closing. Plaintiff further argues that Officer Lopez violated New Mexico law by gaining entry into Plaintiff's house through "fraud and deception" in violation of NMSA §30-14-8. Plaintiff contends that Officer Lopez lied when he claimed to have a right to "come in and speak to him." No evidence of record supports the assertion that Officer Lopez engaged in fraud and deception as those concepts are understood in New Mexico criminal law.

[8]    Officer Lopez and Plaintiff were sometimes talking simultaneously. The quotes are from the discernible parts of the conversation.

characterization that Plaintiff invited Officer Lopez into his home. Officer Lopez had just

told Plaintiff that "he wasn't going to shut the door" on him. *Scott*, 550 U.S. at 380.[9]

Once inside the foyer of Plaintiff's residence, Officer Lopez repeated the allegation that

Plaintiff was, "making threatening phone calls [and he had] a legal right to talk to [Plaintiff]."

(DVD 13:13:18–13:13:25.) Plaintiff again denied the allegation. (DVD 13:13:26–13:14:30.)

Plaintiff appeared unsteady on his feet and slurred his words. (*Id.*) Officer Lopez informed

Plaintiff that another officer was bringing a recording of the message for Plaintiff to hear. (DVD

13:14:01–13:14:07.) Plaintiff asked "So, what rights do I have?" (DVD 13:14:11–13:14:12.)

And, Plaintiff continued to deny the allegation that he made a threatening phone call. (DVD

13:14:13–13:14:41.) Officer Lopez repeated that another officer was bringing a recording for

Plaintiff to hear and tell them if it was his voice. (DVD 13:14:48–13:14:51.) Plaintiff responded

"That's fine, but let me call Lee Des Champs," and Plaintiff started walking toward the kitchen,

which was adjacent to the foyer. (DVD 13:14:53–13:14:57; Mot. Ex. D.) Officer Lopez blocked

Plaintiff's path, and Plaintiff explained, "I'm gonna call my attorney," to which Officer Lopez

replied "stand right here for a minute, I'm not going to tell you again. . . . You can call your

attorney in a minute." (DVD 13:14:54–13:15:03.)

Officer Lopez repeated the allegation from Mr. Torres that Plaintiff threatened Mr.

Torres' son with a gun. (DVD 13:15:10–13:16:01.) After Plaintiff denied the allegation yet

---

[9]     The Court will not accept the argument presented for the first time in the Reply that Plaintiff consented to
the entry into his home. (Reply at 12–14.) Even if properly raised in the Motion, however, there is evidence negating
the voluntariness of Plaintiff's statement to "come on in:" namely, Officer Lopez's warning that Plaintiff was "not
gonna shut a door on me" and Officer Lopez's act of physically blocking the door. Whether consent to a warrantless
search was given "voluntarily" is to be "determined from all the circumstances." *United States v. Abdenbi,* 361 F.3d
1282, 1287 (10th Cir. 2004) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973)). "By clear and positive
testimony, the court must find that the consent is 'unequivocal and specific' and 'freely and intelligently' given,
and the government must prove that consent was given without duress or coercion." *United States v. Lowe,* 999 F.2d
448, 451 (10th Cir. 1992) (citing *United States v. Price,* 925 F.2d 1268, 1270 (10th Cir. 1991)). Under this standard,
Plaintiff did not consent to entry by the officers.

another time, Officer Lopez told Plaintiff, "[l]et us confirm that you didn't make the threat. The other officer is coming over here with a tape recorder. You can listen to it and tell me if that's your voice." (DVD 13:16:25–13:16:50.)

Officer Lopez continued, "[o]ne of my problems too is that Mr. Torres is pretty angry, and I don't want him to come over here . . ." (DVD 13:16:50–13:17:00.) Officer Lopez informed Plaintiff that he and Officer Valenzuela had an obligation to make sure Plaintiff was not arming himself and preparing "to go do this." (DVD 13:17:05–13:17:53.) Plaintiff responded, "you want to come in and see my house?" and Plaintiff began walking out of the foyer toward a hallway. (DVD 13:17:54–13:17:57.) Officer Lopez grabbed Plaintiff's arm, asked Plaintiff to place his hands behind his back, and after a short struggle, Officer Lopez handcuffed Plaintiff. (DVD 13:17:57–13:18:21.) Although Officer Lopez and Plaintiff physically struggled during handcuffing for several seconds, Officer Lopez did not slam Plaintiff into a wall as alleged in the Complaint. (DVD 13:18:07–13:18:21; *cf.* Compl. ¶ 24.) Officer Lopez told Plaintiff that he was not being arrested but was being "detained" for his and the officers' safety. (DVD 13:18:47.) Officer Valenzuela retrieved a chair, placed it in the foyer, and Plaintiff sat in the chair. (DVD 13:18:53.)

Officer Gonzales arrived and played the recording of the phone message. (DVD 13:18:43–13:21:06; Mot. Ex. D.) After Plaintiff heard his own voice on the recording threaten to kill Mr. Torres' son, he said, "I'm not lying about that. I'll put a bullet in that son of a bitch's head." (DVD 13:21:06–13:21:09.)

Plaintiff continued to complain about Mr. Torres' son's actions, and Plaintiff asked the officers to bring Mr. Torres and his wife to Plaintiff's house so Plaintiff could talk to them. (*Id.*) Plaintiff excoriated Mr. Torres' son. (DVD 13:20:08–13:21:51.) Plaintiff then changed his tone

9

and said he "wouldn't hurt anybody." (DVD 13:21:51–13:21:53.) Officer Lopez asked Plaintiff, "are you on conditions of release with the court that tells you you're supposed to be drinking?" and Plaintiff admitted, "well, yeah." (DVD 13:21:57–13:22:03.) Officer Lopez admonished, "You can't drink Mr. Del Curto." (DVD 13:22:07-13:22:09.) Plaintiff responded, "well, gimme a break, man." (DVD 13:22:06-13:22:07.)  Officer Lopez responded, "I can't if you're threatening people." (DVD 13:22:09.)

Officer Lopez told Plaintiff, "here's my fear, Mr. Torres might come over here, and do something, okay, if we don't do our job." (DVD 13:22:14–13:22:17.) Plaintiff suggested, "why don't you get Mr. Torres over here, so I, both of them, please. . . . so we can talk about this." (DVD 13:22:23-13:22:24.) Officer Lopez responded, "[Mr. Torres] doesn't want to talk about this. He wants to come over and duke it out with you." (DVD 13:22:30.) Plaintiff then suggested they bring Mr. Torres' son over to Plaintiff's house because he "destroyed my marriage, man." (DVD 13:22:38.)

Officer Lopez asked Plaintiff if anyone else was at home, and Plaintiff answered, "nobody is here at all." (DVD 13:22:47–13:22:50.) Officer Lopez repeated to Plaintiff that he was on conditions of release with the court "that do not allow you to drink." (DVD 13:23:27–13:23:30.) Officer Lopez explained that Plaintiff was "highly intoxicated," Plaintiff threatened someone, and Plaintiff disobeyed a lawful order. (DVD 13:23:30– 13:23:42.) Officer Lopez further explained that once he had to put his hands on Plaintiff, he had a legal obligation to arrest him and take him to jail. (DVD 13:23:42–13:24:09.) Plaintiff pleaded, "just let me go, man" and later said, "let me call Lee," his attorney. (DVD 13:23:49-13:24:30.) Officer Lopez instructed

one of the other officers to take Plaintiff to a police vehicle. (DVD 13:24:32–13:24:33.) [10]

Before Plaintiff was escorted out of his house in handcuffs, Officer Lopez asked Plaintiff if he had a key to lock his house to which Plaintiff responded "no I don't" to which Officer Lopez replied, "okay, we'll figure something out,"  (DVD 13:24:33–13:25:17.) Plaintiff again asked to call his attorney, and Officer Lopez responded that Plaintiff had a right to call his attorney after his arrest was processed. (DVD 13:24:43–13:24:51.) As he was being taken out the front door, Plaintiff told the officers not to walk through his house. (DVD 13:25:05–13:25:06.) Officer Lopez walked into the kitchen and yelled back toward the front door, "where is there a key at?" (DVD 13:25:09.)  Plaintiff did not respond to the question. (DVD 13:25:09–13:25:11.) As he was being escorted out of his front door, Plaintiff asked three times to be allowed to get dressed, but that request was denied, and Plaintiff was taken outside handcuffed in his bathrobe. (DVD 13:25:12–13:25:28.)

For approximately ten minutes, Officer Lopez and one of the other officers walked through Plaintiff's house, and looked into several rooms, drawers, and closets for a key to the house. (DVD 13:25:17–13:35:02.) After failing to find a house key, Officer Lopez went to the garage, pressed the automatic garage door button, and exited under the garage door as it closed. (DVD 13:34:41–13:35:26.)  While the officers were walking through the house, Officer Lopez and the other officers discussed where the key might be, they tried several keys in the front door, and finally concluded they had to leave out of the garage door. At one point during this time, Officer Lopez found a magazine clip on a bedside table, but laid it back down and commented to the other officer that Plaintiff was talking about loading a gun. (DVD 13:28:56-13:28:59.)

---

[10]     In the Reply, Officer Lopez argues for the first time that he did not violate Plaintiff's Fifth Amendment right to counsel because the exchange with Plaintiff never became a custodial interrogation. The Court will not accept an argument presented for the first time in the Reply. In Count 9, Plaintiff alleged that Lopez violated this 5th Amendment rights. Defendants did not ask for dismissal of Count 9 in the Motion.

III.    DISCUSSION

    A.    *Warrantless Entries*

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In general, searches and seizures are unreasonable and invalid unless based on probable cause and under the authority of a warrant. *See Warrantless Searches and* Seizures, 43 Geo. L.J. Ann. Rev. Crim. Proc. 47 (2014). In *Payton v. New York,* the Supreme Court held that the Fourth Amendment required police officers to have either a warrant or exigent circumstances to enter a home, even when officers have probable cause to arrest for a felony. 445 U.S. 573, 590 (1980). That is so because "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.*

Warrantless arrests in suspects' dwellings are presumptively unreasonable. *See Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011) (stating, "searches and seizures inside a home without a warrant are presumptively unreasonable.'") (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Exigencies—such as fear of imminent destruction of evidence, hot pursuit, or immediate threats to the safety of the public or the officers—can justify a warrantless entry into an individual's home to make an arrest. *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012). Before discussing exigent circumstances, however, the Court will analyze Defendants' argument that Officer Lopez lawfully entered Plaintiff's home under the community caretaking exception to the warrant requirement.

B.      *Community Caretaking Exception*.

The "community caretaking function" applies to police actions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Under this exception, "a police officer may have occasion to seize a person . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *United States v. Gilmore*, 776 F.3d 765, 769 (10th Cir. 2015) (quoting *United States v. King*, 990 f.2d 1552, 1560 (10th Cir. 1993)).

Although this exception is most often applied to seizures involving individuals in vehicles, the Tenth Circuit Court of Appeals has applied it to the seizure of individuals in public areas. *See United States v. Garner,* 416 F.3d 1208, 1212–14 (10th Cir. 2005). But, the Tenth Circuit has held that the community caretaking exception does not allow warrantless entries of structures. *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994). *See also Storey v. Taylor*, 696 F.3d 987, 996–97 (10th Cir. 2012) (concluding that the community caretaking exception did not provide an exception to the warrant requirement when officer ordered person out of his house based on a report of a loud domestic argument).

In *United States v. Bute*, the Tenth Circuit determined that police officers violated the Fourth Amendment when they searched a warehouse in the middle of the night after noticing that the garage door to the warehouse had been left open. 43 F.3d at 535. The Tenth Circuit reasoned that in *Cady*, the Supreme Court did not create a broad exception to the warrant requirement. *Id.* Instead, the Tenth Circuit confined the community caretaking exception to a narrow field of cases in recognition of a clear "distinction between motor vehicles and dwelling places" and in recognition of the myriad roles played by police officers. *Id.* (citation omitted).

C.    *Entries to Render Emergency Aid*

In a hybrid version of the community caretaking exception, the Supreme Court has sanctioned an officer's entry into a person's home without a warrant or probable cause if the officer has an objectively reasonable basis to believe he must enter the house to avoid immediate harm to occupants. *See Michigan v. Fisher*, 558 U.S. 45, 46 (2009) (stating that law enforcement officers may enter a home to render emergency assistance to an injured occupant or to protect the occupant from immediate injury); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (allowing entry by officer responding to noisy party who had witnessed a fist fight through a screen door); *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (recognizing that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid). This is known as the emergency aid exception to the warrant and probable cause requirements. Jeff Fisher, *Lowering the Standards: The Simultaneous-School-Bombing-And-Shooting-Threat Exception of Armijo ex rel. Armijo Sanchez v. Peterson*, 41 N.M.L. Rev. 69, 92–95 (Spring 2011).

The Tenth Circuit has outlined a two-part test for determining whether the emergency aid doctrine applies: "[O]ur test is now two-fold, whether (1) the officers have an objectively reasonable basis to believe that there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable. *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). In most of the cases in which this exception applied, the police officers were acting in their community caretaking capacity as rescuers, faced with an

immediate threat to people inside residences.[11]

      D.     *Exigent Circumstances*.

In general, an officer may constitutionally enter a person's home in the course of a criminal investigation only if one of two criteria is present: (1) the officer has a warrant supported by probable cause; or (2) the officer has probable cause and exigent circumstances. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002). *See Manzanares v. Higdon*, 575 F.3d 1135, 1142–43 (10th Cir. 2009) (stating, "even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within a home, police may not enter without a warrant absent exigent circumstances."). For exigent circumstances to justify a warrantless entry, however, there must also be "no time to secure a warrant." *Missouri v. McNeely*, 133 S.Ct. 1552, 1572 (2013) (quoting, *Michigan v. Tyler*, 436 U.S. 499, 509 1978) *and Schmerber v. California*, 384 U.S. 757, 771 (1966) (warrantless search legal when "there was no time to seek out a magistrate and secure a warrant")).

Under the exigent circumstances exception an officer may enter a home without a warrant if he is in hot pursuit or he reasonably believes that persons in the home will destroy evidence before a warrant can be obtained. *Warren v. Hayden*, 387 U.S. 294 (1967) (upholding entry into home after officer saw a suspected armed robber enter the home minutes after the robbery). In *United States v. Santana*, 427 U.S. 38, 39 (1976), an undercover officer arranged a drug buy with a woman, gave some marked bills to her, and observed her go into Ms. Santana's home to buy drugs. *Id.* at 40. Several officers approached Ms. Santana's house and saw her

---

[11]     *See, e.g., West v. Keef*, 479 F.3d 757, 759 (10th Cir. 2007) (applying exception when police were responding to a 911 call from a 12-year-old boy who said his mother was threatening to hurt herself with a knife); *United States v. Layman*, 244 Fed. Appx. 206, 209 (10th Cir. 2007) (allowing entry into mobile home based on the strong chemical fumes that indicated home was being used as a meth lab); *and Harris v. Ford*, No. 09-3272, 2010 WL 801743 at *1, *4 (10th Cir. May 10, 2010) (allowing entry into home on a report of a self-inflicted gunshot wound even though victim had been taken to the hospital before police arrived because the officers observed blood on a lawn chair, on the front porch, and on the front door of the residence) (unpublished).

standing in the doorway, but she retreated inside when the officers identified themselves. *Id.* The officers crossed the threshold into the vestibule and arrested her. *Id.* The Supreme Court determined that the officers had probable cause to arrest and Ms. Santana's "act of retreating into her house could [not] thwart an otherwise proper arrest." *Id.* at 42.

Under the imminent destruction exigency, the government must show (1) clear evidence of probable cause, (2) investigation of a serious crime where the destruction of the evidence is likely, (3) the search was limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) the circumstances are not subject to police manipulation or abuse. *United States v. Aquino,* 836 F.2d 1268, 1272 (10th Cir. 1988). "To determine the existence of [this] exigency, a court must consider the gravity of the offense supporting arrest." *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). "When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause . . . ." *Howard*, 34 F.3d at 982 (citing *Welsh*, 466 U.S. at 750) (footnote omitted).

> E.      *Officer Lopez did not violate clearly established law.*
>
>     1.      Probable Cause

In Count I of his Complaint, Plaintiff claims that on August 16, 2013, Officer Lopez "unreasonably and unlawfully and without a warrant entered [Plaintiff's] residence[,] seized, detained, falsely imprisoned him, imposed cruel and unusual punishment on him and deprived him of his liberties without due process, without lawful justification, without reasonable suspicion, and without probable cause to believe that a crime had been committed." (Compl. ¶ 44.) Defendants urge the Court to grant Officer Lopez qualified immunity from Plaintiff's Fourth

Amendment claims. Notably, in Count I, Plaintiff alleges that he *exercised* "his Fourth and Fourteenth Amendment rights", his "Eighth and Fourteenth Amendment rights", and "his Fifth and Fourteenth Amendment rights." (Compl. ¶¶ 41-43) (emphasis added). The Motion only asks for dismissal of the Fourth Amendment claim in Count I. Defendants argue (1) that Officer Lopez's entry without a warrant was justified under the community caretaking and exigent circumstances exceptions, (2) that Officer Lopez had probable cause to arrest Plaintiff, and (3) that Officer Lopez "used the force necessary" to detain Plaintiff. (Mot. at 10, 13, & 15.) Despite having alleged in Count I that he exercised his 4th, 5th, and 8th Amendment rights, Plaintiff sets forth in Count 9 claims under the 4th, 5th, 8th, and 14th Amendments and under Article 2 §§ 10 and 18 of the New Mexico Constitution.  The Court will analyze the Motion to the extent it asks for dismissal of the Fourth Amendment claims set forth in Count I and in Count 9. The Court will first deal with probable cause to arrest.

Defendants contend that Officer Lopez had probable cause to arrest Plaintiff for leaving a threatening phone message and for violating the Stipulated Continuance Order by using alcohol. An officer has probable cause to arrest an individual if "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that a crime had been committed." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Under the qualified immunity standard, an officer effecting a warrantless arrest is "'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Romero v. Fay*, 45  F.3d 1472, 1476 (quoting *Hunter,* 502 U.S. at 228).

Officer Lopez reasonably believed he had probable cause to arrest Plaintiff because he had reliable information from Officer Gonzales that Plaintiff left a threatening phone message in

violation of New Mexico law. NMSA 1978 § 30-20-12.[12] Plaintiff denies he made the threatening phone call that day: "I admit to making the recorded message contained in the lapel video to Max Torres Jr. while I was intoxicated, however it was made months prior to August 16, 2013, but I did not make any call the officers complained of to me [sic] in the arrest." (Resp. Ex. 1 Del Curto Aff. ¶ 11.) This testimony does not undermine the Court's conclusion that Officer Lopez reasonably believed he had probable cause to arrest Plaintiff. *Hunter*, 502 U.S. at 228. Regardless of when Plaintiff made the call, it was a crime for which Officer Lopez could arrest Plaintiff. *Walker v. City of Oklahoma City, OK*, No. 98-6457, 2000 WL 135166, *5 (10th Cir. Feb. 7, 2000) (unpublished) (holding that officer had reasonable belief there was probable cause to arrest plaintiff even though she was arrested through mistaken identity). Therefore, Officer Lopez had a reasonable belief there was probable cause to arrest Plaintiff before Plaintiff opened the door.

Second, Defendants argue that Officer Lopez had probable cause to arrest Plaintiff for consuming alcohol in violation of the Stipulated Continuance Order. Officer Lopez testified that he smelled alcohol on Plaintiff's person when Plaintiff opened the door. However, Plaintiff maintains that "[o]n August 16, 2013 I had not consumed any alcohol and was not under the influence of any liquor or drugs, other than my prescription medications. . . ." (Del Curto Aff. ¶ 3.) Hence, there is a disputed issue of fact as to whether Plaintiff had been drinking that day in violation of the Stipulated Continuance Order. The DVD does not provide clear evidence that Plaintiff was intoxicated on alcohol; therefore, the DVD depiction does not resolve the fact issue.

Nevertheless, this factual dispute does not change the Court's conclusion that Officer Lopez had probable cause to arrest Plaintiff. Prior to the encounter, Officer Lopez had a

---

[12]     Under that section, it is unlawful "for any person, with intent to terrify, intimidate, threaten, harass, annoy or offend, to telephone another and . . . threaten to inflict injury or physical harm to the person or property of any person." NMSA 1978 § 30-20-12(A).

reasonable belief, based on the information from Officer Gonzales that Plaintiff had threatened to kill someone in violation of New Mexico law. In addition, Plaintiff violated the Stipulated Continuance Order if he violated state law. Thus, Officer Lopez had probable cause to arrest Plaintiff for both offenses. However, probable cause for the arrest is only one part of the analysis. Officer Lopez also needed a warrant or an exception to the warrant requirement to enter Plaintiff's home without Plaintiff's consent.

2.      Community Caretaking Exception.

Defendant maintains that, under the community caretaking exception to the warrant requirement, Officer Lopez could enter Plaintiff's home to prevent Plaintiff from injuring himself or another. However, under Tenth Circuit case law, the community caretaking exception does not apply to warrantless entries of structures. *See* United *States v. Bute*, 43 F.3d at 535.

Defendants further assert that even if the community caretaking exception is inapplicable, Officer Lopez is entitled to qualified immunity because "the law in this area is not clearly established." (Mot. at 12.) Defendants cite *Bute* as a case that added to the confusion regarding this exception in the Tenth Circuit. *Bute* held that the exception does not apply to the entry of a commercial structure found at night with an open garage door. *Id.* at 534-38. *Bute* did not involve the entry into a person's house. However, *Armijo*, a more recent Tenth Circuit case, has created some confusion on the law in this area.

In *Armijo ex rel. Armijo Sanchez v. Peterson*, the Tenth Circuit Court of Appeals applied the exigent circumstances exception to a situation involving a threat of violence on a large scale. 601 F.3d 1065, 1068–71 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 1473 (2011). In that case, a divided appellate panel of three judges reversed the district court's denial of qualified immunity to officers who entered a home to investigate an anonymous bomb threat phoned into Onate

19

High School in Las Cruces, New Mexico. On the morning of September 22, 2006, security officers at the school learned of a rumor that a student, who was a gang member and who had recently been expelled from the school, was planning to phone in a fake bomb threat and then shoot students as they exited the school. *Id.* at 1068. On the same morning, a parent had called the school to report that her son told her that a student named "Chris" would call in a bomb threat to Onate High School. *Id.* Two calls making bomb threats were received at the high school later that morning. *Id.* Taking the rumor of a shooting more seriously, school officials locked down the school while police investigated the threat. *Id.* School officials and the police zeroed in on one student, Chris Armijo, who they thought had been expelled from Onate High School and who had the reputation of being a gang member. *Id.* It turns out that the officials were wrong about both of those facts: Chris Armijo had recently transferred to another high school and he was not a member of a gang. *Id.* Three officers knocked on the front door of Chris's house and yelled "Police Department. Anybody in here?," "Come to the door," and "Let yourself be known" as loudly as they could for two to three minutes. *Id.* at 1069. When no one answered, one officer tried the doorknob and found it unlocked. *Id.* After consulting with their sergeant, the officers entered the home, found Chris Armijo asleep, pulled him out of bed, handcuffed him, and took him out on the porch in his underwear and t-shirt. *Id.* The officers questioned him and searched his cell phone and home phone. *Id.* After discovering that neither Chris's cell phone nor the house phone had been used to phone in the threat, the officers left. *Id.*[13]

Chris's mother sued the police officers under § 1983 for violating her and her son's Fourth Amendment rights. The district court denied the officers qualified immunity finding a material factual dispute as to whether they had exigent circumstances excusing entry into the

---

[13] The Tenth Circuit found it had jurisdiction over the appeal because it used the facts propounded by the plaintiff on summary judgment instead of accepting the district court's conclusion that a factual dispute precluded summary judgment.

home. Two of the three appellate judges reversed and held that "the exigent circumstances exception permits warrantless home entries when officers reasonably believe that some actor or object in a house may immediately cause harm to persons or property not in or near the house." *Id.* at 1071.

The Honorable Chief Judge Mary Briscoe of the Tenth Circuit Court of Appeals dissented due to concerns that the majority's opinion impermissibly created a "new exception" to the warrant requirement. *Id.* at 1078–80. Judge Briscoe noted that "under the majority's newly recognized exception, law enforcement officials may now enter a home without a warrant or probable cause and presumably seize an occupant thereof so long as they have some type of 'objectively reasonable basis,' . . . for believing that such occupant poses an immediate threat of harm to 'people not in or near the house[.]'" *Id.* at 1080.

> 3.     Exigent Circumstances.

In addition to the argument that Officer Lopez entered Plaintiff's house as a community caretaker, Defendants contend that Officer Lopez reasonably believed he had exigent circumstances allowing entry into Plaintiff's home: (1) Plaintiff had recently been charged with battering another individual; (2) Plaintiff was under a Stipulated Continuance Order related to that charge; (3) Plaintiff had made two telephone threats that day saying he was going to kill someone with a firearm he was loading "as he speaks"; and (4) Officer Lopez smelled alcohol on Plaintiff's person when he answered the door. Plaintiff denies using alcohol and he stated the threatening phone call was made months earlier. Nevertheless, Officer Lopez reasonably believed Plaintiff had made the threats that day based on reliable information from Officer Gonzales. The Court finds that even without evidence that Plaintiff was intoxicated, a reasonable

officer could believe that Plaintiff posed an imminent threat to assault someone with a deadly weapon.

Defendants ask the Court to find that exigent circumstances justify Officer Lopez's entry into Plaintiff's home "in a community caretaking role." This argument is somewhat confusing and implicates the same concerns that arose in *Armijo*. The community caretaking doctrine applies when police are not acting in an investigative role and does not require probable cause. Moreover, the Tenth Circuit had held that the exception does not allow entry into structures. *Bute, supra.* Clearly, Officer Lopez was acting in an investigative role, not a caretaking role. Hence, like the officers in *Armijo*, Officer Lopez must justify his warrantless entry into Plaintiff's house under the exigent circumstances exception.

Without considering intoxication, the Court finds that Officer Lopez's knowledge of Plaintiff's past violent behavior, along with the report that Plaintiff had threatened to kill someone with a gun, justified Officer Lopez's entry into Plaintiff's home to avert the danger that Plaintiff would carry out his threat. The evidence meets the two-part test for exigency: (1) the officer has an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others; and (2) the manner and scope of the warrantless search or seizure is reasonable. *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012) (citing *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006)). Under the first prong, a reasonable officer in these circumstances would have grounds to believe there was an immediate need to avert danger "'guided by the realities of the situation presented by the record' from the viewpoint of 'prudent, cautious, and trained officers.'" *Id.* (citations omitted). In *Armijo*, an anonymous bomb threat coupled with a rumor that the caller intended to shoot students when they exited the school, put the officers "between a rock and a hard place." *Armijo*, 601 F.3d at 1071. According to the

22

majority opinion, "[t]he plausible reports of a bomb and a gun fight posed an emergency. The officers thus had an objectively reasonable basis to believe they immediately needed to protect the lives and safety of those at the high school." *Id.*

In this case, it was incumbent on the Soccoro police to take Plaintiff's threat seriously. And in this case, the officers faced an emergency of much smaller magnitude than in *Armijo* but a violent one nevertheless. Officer Lopez believed Plaintiff had left phone messages threatening to kill someone with a gun he was loading at that moment. Officer Lopez was also aware that Plaintiff was under a court order entered in a case in which Plaintiff had battered another person he believed was having an affair with his wife. Plaintiff answered the door, denied making the threat, and attempted to close the door. At that point, an officer could reasonably believe entry was necessary to prevent Plaintiff from carrying out the threat. Officer Lopez's intention to prevent an imminent confrontation between Mr. Torres and Plaintiff is revealed by Officer Lopez's statement that "Mr. Torres is pretty angry, and I don't want him to come over here . . ." (DVD 13:16:50–13:17:00.) Officer Lopez also informed Plaintiff that he and Officer Valenzuela had an obligation to make sure Plaintiff was not arming himself and preparing "to go do this." (DVD 13:17:05–13:17:53.) Therefore, Officer Lopez's reasonable belief that the circumstances were volatile, based on the phone threat and Plaintiff's prior battery of a person, was legally sufficient to allow warrantless entry and thereby prevent further violence. However, even if Officer Lopez did not have sufficient exigent circumstances to enter Plaintiff's house, the Court finds that Plaintiff has failed to show that the law in this area is clearly established.

4. Law Not Clearly Established.

In *Armijo*, the Tenth Circuit upheld an entry without probable cause, but found exigent circumstances involving a threat to people outside of Chris Armijo's house sufficient to allow a

23

warrantless entry. *Armijo*, 601 F.3d at 1071; Fisher, 41 N.M. L. Rev. at 115–118. The court focused solely on the exigent circumstances exception and allowed the officers to enter the Armijos' home because the officers reasonably believed that "some actor or object in the house may immediately cause harm to persons or property not in or near the house." *Armijo*, 601 F.3d at 1071.

Here, Officer Lopez had probable cause to believe Plaintiff had made the threat based on reliable information from Officer Gonzales who had a recording of the call. Officer Gonzales was detaining Mr. Torres, the recipient of the threat, while Officer Lopez was sent to investigate, Plaintiff, the person accused of making the threat. After Plaintiff denied the accusation and attempted to close the door, a reasonable officer could believe Plaintiff posed a danger. But even if the facts of this case present an insufficient degree of exigency, the Court concludes that Officer Lopez is entitled to qualified immunity from Plaintiff's Fourth Amendment claims.

A reasonable officer, relying on *Armijo*, may not have understood that entry into Plaintiff's house to avert a threat outside of Plaintiff's house would violate the Fourth Amendment. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d at 1186. In other words, an officer, under *Armijo*, could reasonably think he was allowed to enter Plaintiff's home to prevent Plaintiff from carrying out his threat to kill someone with a gun just as the officers in *Armijo* were allowed to enter the Armijos' home to prevent a threat to the students at Onate High School. Plaintiff has failed to show that Officer Lopez violated clearly established law, and the Court will grant him qualified immunity on Plaintiff's Fourth Amendment claims in Count I and Count 9 of the Complaint.

F. *Search of Plaintiff's House*

In Count I, Plaintiff alleges that Defendants illegally searched his home in violation of

the Fourth Amendment: "On August 16, 2013, Defendant Richard Lopez did without Due

Process unlawfully enter Plaintiff's residence and unlawfully search Plaintiff's

residence . . . ." (Compl. ¶ 45.) In Count 9, Plaintiff also alleges a Fourth Amendment claim of

illegal search: "The Defendant Richard Lopez unreasonably and without cause searched

Plaintiff's personal property including his residence." (*Id.* ¶ 98.)

In the Motion, Defendants contend in UMF 22g: "The officers did not illegally search

Plaintiff's home in an attempt to uncover any evidence showing Plaintiff's alleged unlawful

conduct. Rather they were looking for a key in order to lock Plaintiff's residence." (Mot. at 5.)

Plaintiff maintains that Defendant Lopez unlawfully searched Del Curto's residence because a

key was not required to lock Del Curto's door, only to unlock the door from the outside. Plaintiff

contends that "[w]hether officers were illegally searching Del Curto's home is a disputed

material fact that . . . precludes summary judgment." (Resp. at 6.)

As Plaintiff was taken outside in handcuffs, Officer Lopez asked him if he had a key to

lock the door of his house. Plaintiff responded "no" to which Officer Lopez says, "Ok, well,

we'll figure something out," and Plaintiff responds, "Ok," but cautions "don't walk through my

house." (DVD 13:24:59–13:25:23.) Officer Lopez responds, "well, where's there a key at?"

(DVD 13:25:08.) Plaintiff did not answer, but asked to get dressed as the other officer was

escorting Plaintiff out the door. (DVD 13:25:09.)

The Court concludes that Officer Lopez reasonably believed he needed to locate a key to

secure the house, particularly since he had asked Plaintiff if he had a key to which Plaintiff

responded "no," without the explanation, now offered in the Response, that a key was not

required to lock the door. (Resp. at 6.) During his search for a key, Officer Lopez located a gun magazine on top of a table in the bedroom and commented on it to the other officer. (DVD 13:28:55–13:29:00.) Yet, Officer Lopez did not confiscate the magazine, which would have served as evidence of Plaintiff's threat to kill Mr. Torres' son with a gun he was loading "as he speaks." During the time the officer were walking through the home, they found keys, took them to the front door, tried them in the lock, and discovered they did not fit the lock. The officers did not alter their search to look for incriminating evidence but sought out a key in every room of the house. After about ten minutes, Officer Lopez discovered he could lock the door from inside, he then went to the garage, pressed the button that activated the automatic door, and exited while the automatic door was closing.

"A Fourth  Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information." *Ysasi v. Brown*, 3 F. Supp. 2d 1088, 1127 (D.N.M. 2014) (finding that entry into a fenced backyard of mobile home without probable cause or warrant was a violation of the Fourth Amendment because officers confronted suspect with accusations of criminal activity). "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment has "undoubtedly occurred."'" *Id.* (quoting *Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013) *and United States v. Jones*, 132 S.Ct. 945, 950 n.3 (2012)). Since Officer Lopez searched Plaintiff's house to find a key to lock it, and not to find incriminating evidence, the search did not violate the Fourth Amendment, and Officer Lopez is entitled to qualified immunity from Plaintiff's Count I and Count 9 claims that he unlawfully searched Plaintiff's home.

G. *Dismissal of Plaintiff's Defamation Claim.*

In Count 7, Plaintiff alleges that Officer Lopez is liable for defamation of character because he knowingly and intentionally made false statements regarding Plaintiff in open court. (Compl. ¶ 83.) Defendants assert that Officer Lopez is entitled to absolute prosecutorial immunity for all statements made in initiating and pursuing a criminal prosecution. (Mot. at 16.) The Court will dismiss this claim because Officer Lopez, as a witness, is entitled to absolute immunity from liability for defamatory statements made in court proceedings. *Zuniga v. Sears, Roebuck & Co.*, 100 N.M. 414, 417, 671 P.2d 662, 665 (Ct. App. 1983) (citing *Neece v. Kantu*, 84 N.M. 700, 507 P.2d 447, (Ct. App. 1973)). Testimony by Officer Lopez at court proceedings against Plaintiff was privileged, and Officer Lopez is immune from liability for defamation. Thus, Plaintiff's defamation claim in Count 7 will be dismissed.

H. *Plaintiff's Fifth Amendment Claim*

In the Response, Plaintiff disputes Defendants' UMF 22b, which states, "Officer Lopez did not deny Plaintiff his right to counsel and that he advised Plaintiff of his right to speak with counsel once Plaintiff's arrest had been processed . . ." (Mot. at 5.) Plaintiff asserts that Officer Lopez "continued to question [Plaintiff] after he invoked his Constitutional right to counsel." (Resp. at 4 & 7.) Plaintiff argues since Officer Lopez only got the information supporting probable cause from Plaintiff after Plaintiff invoked his right to counsel, Officer Lopez cannot use that information to support a finding that he had probable cause to arrest Plaintiff. (Resp. at 16.) Plaintiff asserts that "evidence obtained after violation of a person's rights is not to be considered [sic] probable cause for an arrest or warrantless entry into a residence." (*Id.* at 17.) Plaintiff contends that Officer Lopez ignored Plaintiff's invocation of his Fifth Amendment right

to counsel and Miranda warnings multiple times and continued to interrogate him even after he was handcuffed." (*Id.* at 18.)

In the Reply, Defendants assert that Officer Lopez did not violate Plaintiff's Fifth Amendment rights because the questioning of Plaintiff never became a "custodial interrogation." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (stating two aspects of custodial interrogation: (1) the suspect must be in custody, and (2) the questioning must meet the legal definition of "interrogation."). Defendants maintain that there was no interrogation of Plaintiff because Officer Lopez was not asking Plaintiff questions "designed to illicit incriminating answers." (*Id.*) Neither side in this debate explains how Plaintiff's claim under the Fifth Amendment is before the Court on summary judgment. Nowhere in the Motion did Defendants ask for dismissal of Plaintiff's claim that Defendants violated his Fifth Amendment rights. After reciting UMF 22b, the closest Defendants come to requesting dismissal of this claim is when Defendants generally aver that "Officer Lopez did not violate Plaintiff's Constitutional Rights, and that as a result, Officer Lopez is entitled to summary judgment on the basis of qualified immunity." (Mot. at 15.) This broad argument is insufficient to bring before this Court a request to dismiss Plaintiff's claim that his Fifth Amendment rights were violated. [14]

I. *Excessive Force*

In the Motion, Defendants claim as an undisputed fact: "Officer Lopez used necessary force when he handcuffed Plaintiff and placed him under arrest." (Mot. at 5.) In the Response, Plaintiff contends:

---

[14] The Court recognizes that Plaintiff has attempted to fold into Count I and Count 9 myriad claims for violations of Plaintiff's constitutional rights. This ruling dismisses all claims for violations of the Fourth Amendment to the extent they are asserted in these two counts of the Complaint.

> Plaintiff received severe bruises from the arrest by Officer Lopez. Del Curto Aff.
> ¶ 10. Whether Defendant Lopez used necessary force when he handcuffed Del
> Curto and placed him under arrest is disputed as to whether he was actually
> arrested or just detained for his and the officer's protection is disputed and
> precluded [sic] summary judgment.

(Resp. at 5.) As with Plaintiff's claim under the Fifth Amendment, there is no clear request in the

Motion that the Court dismiss Plaintiff's Count 8 claim that he was subjected to excessive force.

(Compl. ¶¶ 87–92.)  Therefore, the Court will not address these arguments.[15]

　　　IT IS ORDERED that DEFENDANTS' MOTION FOR PARTIAL SUMMARY

JUDGMENT ON CIVIL RIGHTS CLAIMS AGAINST OFFICER LOPEZ ON THE BASIS OF

QUALIFIED IMMUNITY, QUASI JUDICIAL IMMUNITY AND ABSOLUTE

PROSECUTORIAL IMMUNITY (Doc. No. 22) is granted as follows:

　　　1. The Court will dismiss Plaintiff's Count I and Count 9 claims for violations of the

Fourth Amendment because Officer Lopez is entitled to qualified immunity from those claims.

　　　2. The Court will dismiss Plaintiff's Count 7 claim for defamation.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[15] The Court notes that, as depicted in the video, it appears that Plaintiff was not treated with excessive force, he did not complain about tight handcuffs, and does not assert more than a *de minimis* injury from his arrest.